The KROGER CO. and Genesco, Inc., Petitioners-Defendants,

v.

CHEMICAL SECURITIES COMPANY, Respondent-Plaintiff.

Supreme Court of Tennessee.

Aug. 25, 1975.

Robert J. Walker, Bass, Berry & Sims, Nashville, for petitioners-defendants.

John T. Conners, Jr., David J. White, Boult, Cummings, Conners & Berry, Nashville, for respondent-plaintiff.

## OPINION

BROCK, Justice.

This case involves the construction of a shopping center lease to ascertain whether it contains an implied covenant by the tenant to occupy and operate a supermarket on the premises and an implied prohibition against subleasing to a nongrocery enterprise and without permission.

The Madison Square Shopping Center in Madison, Davidson County, Tennessee, was opened to the public in 1956. Located on thirty acres of land, the shopping center is comprised of seven buildings and a parking lot for 2500 vehicles. Forty-six independent businesses occupy the 343,000 square feet enclosed in the buildings.

The Kroger Company was among the original tenants of the shopping center; it entered a lease on January 1, 1956, with Madison Square Shopping Center, Inc., for an area at the end of the largest building and opened a supermarket. The leases of several other original tenants required the landlord to acquire a minimum ten year lease for a Kroger supermarket.

In 1962 Kroger threatened to close the grocery store and move out of the shopping center to larger accommodations; whereupon the landlord agreed to expend $100,-000.00 for improvements requested by the tenant. The money was spent to remodel and enlarge the Kroger store by 50%.

At that time Mr. John Dyson, real estate manager for Kroger in Nashville, and Mr. W. H. Criswell, the agent for the shopping center, negotiated a new lease. According to Mr. Dyson, Mr. Criswell was known as the dean of real estate men and the leading shopping center negotiator in Nashville at the time. "He had the reputation of being an extremely tough negotiator."

The new lease was signed on June 5, 1962. The rental under this lease is $2,812.50 per month plus one percent of the tenant's annual sales in excess of $3,375,-000.00. The base rental is high and has comprised the entire rental under this lease because Kroger's sales never achieved the sum necessary for an override payment. The term of the lease is ten years, and the tenant has the option to make three renewals of five years each. Due to a subsequent lease modification the ten year term commenced on November 1, 1963, and expired on October 31, 1973. The only express proscriptions in the lease on the tenant's use of the premises are that he not use them in an unlawful manner and that he not use them for a drugstore without written approval of the landlord. The landlord promised not to lease any premises for the sale of groceries within 1000 feet of the Kroger store, except one small corner store previously occupied

by A & P Grocery. The lease states that its provisions shall bind and benefit the parties and their heirs, executors, administrators, successors and assigns. There is no clause in the lease concerning the right of the tenant to assign or sublet, but clause 26h provides that if the tenant voluntarily vacates the premises and they remain vacant for one year, the landlord has the right to cancel the lease and re-enter the premises.

On July 1, 1965, Chemical Securities Company, the plaintiff in this case, purchased all the real estate, store leases, and other assets of Madison Square Shopping Center, Inc., and the latter corporation was dissolved.

On July 16, 1973, shortly before the conclusion of the ten year term, Kroger entered into a sublease with Genesco, Inc., for the store, and on September 29 vacated the premises. According to Kroger the primary reason for the move was the declining sales at the supermarket. The subtenant assumed all of Kroger's obligations under the prime lease; the term of the sublease is equal to the three remaining extension periods of fifteen years and the subtenant's rental of $2,812.50 per month, to be paid to Kroger, is the same as the base rental under the prime lease. Genesco agreed not to assign or sublease the property without the consent of Kroger. The subtenant's use of the premises is limited to the sale of shoes, clothing and general merchandise, and he agreed not to use the premises in any manner which would compete with Kroger's business. The record reveals that Kroger operates another supermarket in Rivergate Shopping Center several miles away. The record also discloses that Winn-Dixie Louisville, Inc., has indicated to Chemical Securities Company that it is interested in leasing the Kroger store and opening a supermarket.

On September 19, 1973, the landlord filed a complaint in Chancery Court against the tenant and the subtenant claiming that Kroger's sublease of the property to Genesco for use as a commissary was inconsistent with the terms of the prime lease and a breach of the tenant's implied warranty to occupy the premises. The complaint requested a temporary injunction enjoining the transfer of the premises to Genesco during the pendency of the action, and that the sublease be annulled. The complainant further prayed that the prime lease be terminated or that the tenant be permanently enjoined from subleasing its premises to a nonretail grocery store and without prior approval of the landlord.

The Chancellor granted the temporary injunction and after a full hearing of the cause he found the prime lease vague and uncertain and admitted extrinsic evidence as to its meaning. He was particularly impressed by evidence of the cooperative nature of a shopping center operation and evidence of the essential role of a large grocery store in the economic success of the Madison Square Shopping Center. In his view Kroger could have vacated the premises without any further obligations but chose instead to sublease the premises at no profit to a nongrocery enterprise in order to lessen competition with its Rivergate Store. The Chancellor concluded that the intention of the parties to the prime lease was for the tenant to occupy and operate a grocery store on the demised premises and not to sublet. He ordered that the sublease be declared void and the prime lease terminated.

The Court of Appeals affirmed, finding the lease to be vague with respect to subletting. It concluded from evidence of the surrounding circumstances that if the subject of subletting by Kroger to a nongrocery operation had been mentioned the lessor would have insisted upon a covenant against subleasing without its permission and Kroger would have agreed. It also concluded that Kroger was guilty of bad faith in prohibiting its subtenant from going into the retail grocery business and that such bad faith warranted forfeiture of the prime lease as well as annulment of the sublease.

Whereupon, Kroger and Genesco petitioned this Court for a writ of certiorari which was granted.

■ The petitioners argue first that the Court of Appeals erred in admitting and considering evidence of circumstances surrounding the execution of the lease. We disagree.

In *Jeffers v. Hawn*, 186 Tenn. 530, 212 S.W.2d 368 (1948), this Court stated:

"While this lease contract cannot be varied by oral evidence 'the course of previous dealings, the circumstances in which the contract was made, and the situation of the parties as aids in determining the meaning of the contract—are matters proper to be looked to by the court in arriving at the intention of the parties to the contract.' *Southern Pub. Ass'n v. Clements Paper Co.*, 139 Tenn. 429, 432, 201 S.W. 745, L.R.A.1918b, 580." *Jeffers v. Hawn, supra*, at 370.

Likewise in *Frierson v. International Agricultural Corporation*, 24 Tenn.App. 616, 148 S.W.2d 27 (1940), the Court expounded:

"No one disputes the proposition that you cannot vary the terms of a written contract nor contradict it by oral evidence, but these rules do not restrain the Court from a survey of the whole situation and an ascertainment of that which the parties had in mind and the purpose or object to be obtained by a proposed agreement." Id. at 37.

See also *Commerce Street Co., Inc. v. Goodyear Tire & Rubber Co., Inc.*, 31 Tenn.App. 314, 215 S.W.2d 4 (1948).

The primary issue to be resolved in this case is whether the Court of Appeals erred in construing the lease to contain an implied covenant of continuous occupancy and operation of a grocery business and an implied prohibition against subleasing without permission.

"It may be stated generally that implied covenants are not favored in the law; and courts will declare the same to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made. Furthermore, implied covenants can be justified only upon the ground of legal necessity arising from the terms of the contract, or the substance thereof, and the circumstances attending its execution; and the implication from the words must be such as will clearly authorize the inference of an imputation in law of the creation of a covenant." *Cousins Investment Co. v. Hastings Clothing Co.*, 45 Cal.App.2d 141, 113 P.2d 878, 879 (1941).

This Court has applied this rule to implied covenants in leases. In *Central Drug Store v. Adams*, 184 Tenn. 541, 201 S.W.2d 682 (1947), the Court held that covenants restricting the use of leased property should be strictly construed according to their express terms and not expanded by implication.

■ The courts have no rightful authority to make contracts for litigants. With regard to subletting and assignment in particular, this Court has long held that a lessee may freely transfer the demised premises without the lessor's consent, absent a covenant in the lease restricting the right of assignment. *Stone v. Martin*, 185 Tenn. 369, 206 S.W.2d 388 (1947). Also, the general rule is that covenants against subletting are strictly construed against the lessor. *Woods v. Forest Hill Cemetery*, 183 Tenn. 413, 192 S.W.2d 987 (1946).

■ From these cases we have concluded that the landlord, Chemical Securities Company, bears a heavy burden in proving that the lease contains an implied covenant of continuous occupancy and operation of a grocery and an implied limitation on subleasing. Such implied covenants must arise from the terms of the lease itself.

One clause which might, arguably, support such covenants is the percentage rental

clause. However, the Court of Appeals did not rely on this provision in reaching its conclusion, and considering the substantial sum set as the base rental and the small and speculative nature of the override, we likewise do not find that clause determinative. See *Cousins Investment Co. v. Hastings Clothing Co., supra; MacFadden-Deauville Hotel v. Murrell*, 182 F.2d 537 (5th Cir. 1950); *Stop & Shop, Inc. v. Ganem*, 200 N.E.2d 248 (Mass.1964).

■ It is also suggested that the implied covenants emanate from the landlord's promise not to lease any other premises in the shopping center, except the former A & P store, to any business for the sale of groceries. The Court of Appeals relied on this express covenant and the shopping center context and circumstances surrounding the execution of the lease as the source of the implied covenants.

However, in our opinion this restriction on competition written into the lease is not broad enough to give birth to implied covenants of continuous occupancy and operation of a grocery business and a prohibition against subleasing to a nongrocery and without the lessor's permission.

The absence of language in this lease on which to base such covenants distinguishes this case from two New Jersey shopping center cases cited by the landlord, *Ingannamorte v. Kings Super Market, Inc.*, 55 N.J. 223, 260 A.2d 841 (1970) and *Dover Shopping Center, Incorporated v. Cushman's Son's, Inc.*, 63 N.J.Super. 384, 164 A.2d 785 (1960). In *Dover Shopping Center, Inc.*, the tenant covenanted "beginning as soon after the commencement of the term as is reasonably possible and continuing during the full remaining term of this lease, to operate its business in the demised premises; to keep its store open daily for the regular conduct of its business therein during the same hours at least as are customarily employed by other similar stores in the neighborhood of the demised premises . . ." Id. at 787. In *Ingannamorte*, the lease provided that the leased store was "to be used and

occupied only for a supermarket. . . ." Id. at 841. The tenants in both cases had closed their stores and left the premises vacant although they continued to pay rent. In *Ingannamorte* the court concluded that an implied covenant of continuous use flowed from the express language of the lease taken in the shopping center context where tenants form interdependent economic units; it ordered the tenant to resume business or give up possession of the premises. In *Dover Shopping Center, Inc.* the court also found a covenant of continuous use and ordered the tenant to reopen his store.

The landlord also cites *Slidell Investment Company, Inc. v. City Product Corporation*, 202 So.2d 323 (La.App.1967), to support its propositions, and that case was heavily relied upon by the Court of Appeals. In *Slidell* the landlord "instituted a suit against a tenant who maintained a variety store in his shopping center for rental payments owing. The lease provided that the premises were to be used "for the sale, storage or display of goods, wares and merchandise" (Id. at 324) and that no other tenant of the center could operate a variety store. The tenant was obligated to pay a base rental and a percentage of his annual sales. In the year prior to the closing of the tenant's store the percentage override constituted nearly 50% of the rent. The tenant operated a very successful variety store on the premises for several years, but when a new shopping center opened across the street he decided to lease a store in that center, with exclusive rights as a variety store, and use the old store as a warehouse. The tenant subsequently vacated the old premises and sublet them, thereafter tendering to the landlord only the basic rental. The tenant prohibited the subtenant from using the premises as a variety store thus eliminating competition in both centers with his variety store. The court held the tenant liable to the landlord for the basic rental and override payments for the term of the lease on the theory that the lease contained an implied continuous oper-

ation clause. The court noted, however, that if the tenant's store had been a financial failure through no fault of his own before he moved out, that he would not have been obligated to continue operations. In our opinion the *Slidell* case is clearly distinguishable from the one at hand. *Slidell* was a suit for rent and was based on a lease where the percentage override was very substantial.

Unlike the leases in the cases above, we find no terms in this lease which justify the finding of the implied covenants. In fact the lease reveals that the parties considered departure from the premises by Kroger before the term expired to be a clear possibility. Clause 26h gives the landlord the right to cancel the lease and re-enter the premises if the tenant vacates them *and* they remain vacant for a year. In our opinion this clause recognizes Kroger's right to vacate the premises and the right to sublease them provided Kroger does so within one year of vacating.

The Court of Appeals found that the leases of four other major tenants of the center required the landlord to maintain a grocery store in the center. The petitioners assign error to this particular finding of fact and we sustain their assignment. The other leases merely provided that the landlord acquire a minimum ten year lease with Kroger; such a lease was obtained and it expired long before the sublease to Genesco.

The negotiators of this lease were very sophisticated and knowledgeable. In our opinion if they had intended the lease to contain a covenant of continuous occupancy and operation of a grocery business and a prohibition against subleasing for a nongrocery use, and without permission, they would have made an express statement in the lease. Evidence of the lease negotiations presented at trial indicates that these provisions were purposely excluded. Mr. Dyson recounted those negotiations:

"Q. Do you recall whether the attention—your attention and the attention of Mr. Criswell—was drawn to the possibility of Kroger's vacating these premises?

"A. Yes, sir, it was because one of the clauses in the lease—and Mr. Criswell made a point of this that if The Kroger Company ceased to operate that the owners wanted the right to cancel the lease if the premises were vacant, I believe for as much as a year. I'd like to review that. That is correct. Under paragraph 26–h of the lease.

"Q. Your reference is to paragraph 26–h —was that the result of the concern over Kroger's vacating the premises? Was that provision put in there because of that?

"A. Yes, Mr. Criswell said it did not do any shopping center any good to have a vacancy, somebody not occupying space within a center.

\* \* \* \* \* \*

"Q. What was your practice at that time insofar as putting a restriction in a lease that would deny you the right to sublease?

"A. To my knowledge I don't recall ever one being in any lease.

"Q. How did you as a real estate manager of this division—what importance did you place upon your right to sublease this store if it became uneconomical.

"A. I placed quite a bit of importance on it because we sublease quite a few stores in any tenure with The Kroger Company in Atlanta and in Nashville.

"Q. Now with all due respect, Mr. Dyson, the lease also does not make any specific mention of any agreement on Kroger's part to continuously occupy the premises as a grocery store. Are you aware of that?

"A. Yes, sir, I am, and that was one of the sanctimonious things, I guess, in the trade. They never put a restriction in a lease that they guaranteed to operate a facility.

"Q. You say 'they'?

"A. The Kroger Company. I don't believe that it would have been approved.

"Q. In your experience at that time being the real estate negotiator for Kroger in this vicinity, was that the case in your other leases here?

"A. Yes, sir.

"Q. Was that an important or unimportant factor to you—

"A. It's—

"Q. —that you did not have the obligation to continuously occupy?

"A. Very important factor if you wanted to make a deal."

It is our conclusion that the record does not support a finding that the parties impliedly agreed upon the covenants as asserted by the respondent. Therefore, we reverse the decree of the Court of Appeals and render judgment in favor of the defendants, Kroger and Genesco. All costs of this appeal are taxed against the plaintiff, Chemical Securities Company.

FONES, C. J., and COOPER, HENRY and HARBISON, JJ., concur.