# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 26, 2012 Session

## JANE FIELD v. THE LADIES' HERMITAGE ASSOCIATION

**Appeal from the Chancery Court for Davidson County**
**No. 07-783-11     Carol McCoy, Chancellor**

_____

**No. M2011-01736-COA-R3-CV - Filed October 19, 2012**

_____

This is the second round in a long-running dispute over the provisions in a warranty deed conveying historic Tulip Grove to the Ladies Hermitage Association (LHA). In the deed LHA agreed to make certain payments to the grantor and her heirs. In a prior appeal this Court affirmed the chancellor's ruling that the property did not revert to the heirs so long as LHA paid the heirs at least $600 every six months. On remand the chancellor held that LHA did not have an implied obligation to keep the property open for paid tours and that LHA did not have to share with the heirs the income derived from renting the property for special events. We affirm the chancellor on the implied obligation and reverse the holding on the heirs' right to a portion of the special event income.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part.**

BEN H. CANTRELL, SR. J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

W. Gary Blackburn and C. Dewees Berry, Nashville, Tennessee, for the appellant, Jane Field.

Robb S. Harvey, Heather J. Hubbard and Mark M. Bell, Nashville, Tennessee, for the appellee, The Ladies' Hermitage Association.

# OPINION

## I.  FACTS AND PROCEDURAL HISTORY

### A.  The First Appeal

The plaintiff/appellant Jane Berry Field ("Field" or "heirs") is the granddaughter and heir of Jane B. Buntin.  Jane Buntin and her husband bought the property known as Tulip Grove in 1914.  The property consists of 26.33 acres and a home that belonged to Andrew Jackson Donelson, nephew of Rachel Jackson.  Tulip Grove is near the Hermitage, home of Andrew Jackson.  Defendant LHA is a non-profit organization that has overseen the Hermitage and its surrounding property since 1889.

Ms. Buntin, who had been active in LHA, signed a warranty deed dated March 11, 1964 transferring Tulip Grove to LHA in exchange for promises by LHA to pay Ms. Buntin and her heirs certain monies.  The deed reads, in part:

> FOR AND IN CONSIDERATION of the sum of Ten Dollars ($10.00) cash in hand paid and other good and valuable consideration, hereinafter described, paid and to be paid by the Ladies' Hermitage Association, hereinafter "GRANTEE" to Jane B. Buntin, hereinafter "GRANTOR", receipt of all of which is hereby acknowledged and in addition, the said Grantee, by the acceptance of this Deed, agrees to pay to Grantor, her heirs and assigns, for a period of ninety-nine (99) years from and after March 1, 1964 one-third (1/3) of all gate receipts received by Grantee from visitors to Tulip Grove House located on said land, which payments are to be made on a monthly basis.  If for any period of six (6) calendar months hereafter beginning July 1 to December 31, and from January 1 to June 30, and for each succeeding year, Grantee should fail to pay to Grantor, her heirs and assigns, from such gate receipts or from other funds of Grantee at least $600.00 (except during such time as Tulip Grove House is being restored or rebuilt after fire or other casualty), then and in that event the title to the property herein conveyed shall revert to Grantor, her heirs and assigns, and this deed shall become null and void.

In subsequent years, Tulip Grove was restored by LHA, and LHA enjoyed success in charging visitors to view the house and grounds. From 1965 to 2001, LHA paid to Ms. Buntin and her heirs over $300,000.00 out of the proceeds from the fees charged to admit people to the house. From 1971 to 2001, LHA sold joint admission tickets to both The Hermitage and Tulip Grove, but kept records of how many people visited Tulip Grove and paid the heirs accordingly. In 2001 however, LHA determined that keeping the Tulip Grove house open for tours had become unprofitable and closed it to the general public. LHA continued to pay the heirs at least $600.00 every six months.

After 2001, LHA began using the Tulip Grove property in a technically different fashion by renting it to individuals or groups for use during "special events" such as wedding receptions or corporate dinners. LHA did not pay to the heirs any portion of the receipts from these special events. LHA began selling tickets specifically for the house again in 2008, and in 2010 there were enough profits from these tickets to pay Buntin's heirs an amount over $600.00 for each six months.

In April of 2007 the heirs filed suit alleging LHA had failed to comply with its obligations under the deed. They claimed LHA failed to make payments as required under the deed and that the property should revert. They asked the court to order an accounting. LHA counterclaimed claiming there was no reversion and, in the alternative, adverse possession. The matter was heard on two motions for partial summary judgment filed by LHA. One sought to narrow the accounting and one sought a finding that no reversion should occur. The motion which sought to narrow the accounting was unopposed[1], and by order dated October 27, 2008 the trial court limited the accounting and found that "gate receipts" as used in the deed meant tickets for tours of the house and not charges for special events on the grounds. On November 12, 2008 the trial court entered an order on LHA's second motion for summary judgment and found that reversion was not warranted. The court incorporated by reference its order of October 27. This order was appealed by Field and the sole issue on that appeal was whether the property had reverted to the heirs. This Court held that it had not and affirmed the

_____

[1]On appeal, this Court noted that "[i]t would be difficult to challenge the October order on appeal when no objection was raised to the trial court."

November 12 order.  This Court made a point of not addressing the definition of gate receipts in the October 27 order.[2]

## B.  The Present Appeal

On remand, the case proceeded to be heard on the parties' cross-motions for summary judgment.  Plaintiff claimed that closure of the property constituted a breach.  By order dated January 4, 2011, the trial court found that LHA had not breached the warranty deed by closing the Tulip Grove house to visitors and granted LHA's motion for summary judgment.  Field then filed a motion to alter or amend seeking to amend the court's order of January 4 to state that the court had not previously ruled on whether plaintiff was entitled to a portion of rental income and whether failure to remit a portion of these receipts constituted a breach.  At a hearing on February 18, 2011 the court determined that it would hear further evidence on the issue of revenue LHA had received over the previous six years and instructed the parties to submit evidence on the issue by stipulation or affidavit.

After the court reviewed the evidence submitted, it issued a Memorandum and Order dated April 12, 2011 stating that an evidentiary hearing would be necessary to determine the issue.  The hearing was held on July 13, 2011 and the court found that gate receipts did not include rental of the house for special events.  Plaintiff now appeals.

## II. ANALYSIS

## A.  Standard of Review

The facts in this case are undisputed.  Therefore, this appeal involves only questions of law.  *See Union Carbide Corp. V. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993).  The standard of review for questions of law is de novo upon the record with no presumption of correctness.  *Id.*  The interpretation of a deed is a matter of law.  *Rodgers v. Burnett,* 65 S.W. 161, 162 (Tenn.1901).

---

[2]The Court also noted that "[t]he case is still pending before the trial court on several issues, including whether the heirs are entitled to a monetary recovery from LHA based on its failure to pay the Heirs of the gate receipts."

**B. Appellant's First Issue**

The appellant's first issue on appeal is: LHA HAS BREACHED ITS OBLIGATION TO USE REASONABLE DILIGENCE TO GENERATE GATE RECEIPTS.

Although this obligation is not expressed in the deed, the appellant contends that "the duty to collect gate receipts is an unexpressed but essential element of the agreement." In support of this argument, the appellant relies on numerous cases in Tennessee and elsewhere that find implied obligations arising from written agreements that are otherwise silent on the subject.

The common law of Tennessee imposes on the parties to all contracts an implied obligation of good faith and fair dealing. *Waller v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn.1997); *TSC Industries, Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn.Ct.App.1987). But the obligation sought to be enforced by the appellant in this case is an obligation implied in fact. *BVT Lebanon Shopping Center v. Wal-Mart Stores*, Inc., 1999 WL 236273 (Tenn.Ct.App.1999). The courts recognize that "contracts implied in fact arise under circumstances which according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." *Weatherly v. American Agricultural Chemical Co.*, 65 S.W.2d 592 (Tenn.Ct.App.1933). The *Weatherly* Court went on to say;

> [t]he court can declare implied covenants to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made. And before a covenant will be implied in the express terms of the contract, or in view of the customs and practices of the business to which the contract relates, it must appear therefrom that it was so clearly in the contemplation of the parties that they deemed it unnecessary to express it, or that it is necessary to imply such covenant in order to give effect to the purpose of the contract as a whole.

Id. at 598.

As useful as they are in carrying out the intent of the parties, implied obligations are not favored in Tennessee. *Kroger Co. v. Chemical Securities Co.*, 526 S.W.2d 468, 471 (Tenn.1975)(citing *Cousins Investment Co. v. Hastings Clothing Co.*, 113 P.2d 878, 879 (Cal.1941)). They "can be justified only upon the ground of legal necessity arising from the terms of the contract." Id.

The requirement of legal necessity may be satisfied if the implied provision is essential to the contract. *Weatherly v. American Agricultural Chemical Co.*, 65 S.W.2d 592, 598 (Tenn.Ct.App.1933). It is harder, however, to show a legal necessity where the negotiations were conducted by sophisticated and knowledgeable parties. *Kroger* at 468.

Based on these legal principles we are convinced that the chancellor properly rejected the argument that the deed to LHA contained an implied obligation to continue to generate gate receipts and pay a percentage to the grantor's heirs.

We do not think the Court can (1) infer from the express terms of the deed a mutual intention to include that provision, or (2) find that that provision is essential to the effect the purpose of the written contract. *See, gen. Weatherly.* Nor do we think the implied obligation can be justified on the ground of legal necessity. *Kroger.* The parties were sophisticated and knowledgeable and they were represented by two of the leading law firms in the city. The individual lawyers involved in the transaction would have made a short list of the city's well-known and respected practitioners. It is doubtful that they would have considered a requirement of continuous operation so accepted and well known that it was not necessary to include it in the agreement.

The history of payments to the grantor and her heirs also suggests that the parties intended to leave to LHA the choices about how the property would be operated. From the date of the deed, March 11, 1964, to March 15, 1965 the property was not open for tours. The grantor was paid $1200 for 1965. On March 15, 1965 after the house was renovated by LHA, the house was opened to the public for general admission tours. Between 1965 and 1971, LHA paid the grantor between $1200 and $2088.33 each year.

In 1971 LHA decided to stop selling separate individual general admission tickets to the house and included it in a package tour with the Hermitage. Payments to the grantor increased dramatically to $17,390.82 for that year. It is noteworthy that the decisions to include Tulip Grove house as part of the package and how to allocate the

ticket price ($0.50 to Tulip Grove, $2.00 to the other properties on the tour) were made exclusively by LHA. During the 1990s visitorship to Tulip Grove declined substantially and in August of 2001 LHA decided to stop providing tours of the house for general admission ticketed visitors. The expenses involved in operating the property and in renovating the house to comply with government regulations had a bearing on the decision.

Finally, to infer that the parties to the deed had an unexpressed intent to maximize the return to the grantor and her heirs would treat this transaction as a commercial arms-length deal free of any donative intent on the part of the grantor. The grantor, however, served as a board member of LHA from 1939 to 1954. Her daughter-in-law served on the board from 1954 to 1983 and served as Regent of LHA from 1965 to 1969. The grantor's son and daughter-in-law actually lived at Tulip Grove during the time when the transfer was being negotiated. It would be easier to draw an inference that a wish to preserve Tulip Grove as part of the Hermitage was a substantial part of the consideration for the transfer.

These same considerations help to distinguish this case from *BVT Lebanon Shopping Center LTD v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132 (Tenn.2001)(affirming the Court of Appeals decision in 1999 WL 236273 (Tenn.Ct.App.1999). Both Courts affirmed the trial court's holding that a commercial lease had an implied covenant of continued operation. The lease in question in *BVT,* however, was for an anchor tenant in a shopping center and the base rent would not have amortized the cost of an expansion financed by the landlord at the beginning of a new term. In addition, the Courts were concerned about the effect on the shopping center as a whole if the anchor tenant left. In fact, the transferee generated sales in the range of 10% to 30% of the sales generated by the anchor tenant. Both Appellate Courts held that the proper measure of damages was the diminution in value of the shopping center, not the lost stream of income.

## C. Appellant's Second Issue

The Appellant's second issue on appeal is: THE HEIRS OF JANE BUNTIN ARE ENTITLED TO ONE-THIRD OF ALL REVENUES COLLECTED FOR THE ADMISSION OF SPECIAL EVENT VISITORS TO THE TULIP GROVE HOUSE.

We start by noting that this issue involves a term included in the deed itself, not an implied term. The deed requires LHA, for a period of ninety-nine years, to "pay to Grantor, her heirs and assigns,.. one third (1/3) of all gate receipts received by Grantee from visitors to Tulip Grove House located on said land..."

The Affidavit and deposition testimony of the current President and Chief Executive Officer of LHA showed that LHA had admitted visitors to the property for special events and that LHA had not shared any of the revenue with the Plaintiff. He said the special events included weddings, receptions, corporate dinners and other events. The typical charge for such use of the property was $1,100 for each event. By his interpretation of the deed, the obligation to share revenue with the grantor's heirs only extended to the sale of individual tickets to persons who toured the property because of their interest in its history and its contents. This interpretation mutually excludes rentals derived from special events where people attend because of the event and are otherwise uninterested in the property's history.

In her final Order, the chancellor said:

1. The Court has held, and continues to hold, that the Warranty Deed should be interpreted and construed as a matter of law. Plaintiff Jane Field has presented a number of arguments that she, and her sister Ms. Gray, should, in addition to a portion of receipts from ticketed visitors to Tulip Grove House, have been paid by Ladies' Hermitage in the past, and be paid in the future, one-third of any rental payments received by Ladies' Hermitage in connection with special events at Tulip Grove House such as an occasional wedding reception or corporate/nonprofit function. Ladies' Hermitage has made payments since 1965 to the Grantor, Jane Buntin, or to the heirs of Jane Buntin, based upon receipts from ticketed visitors to Tulip Grove House. The Court holds that the Warranty Deed, and specifically the phrase "all gate receipts received by Grantee [Ladies' Hermitage] from visitors to Tulip Grove House located on said land" does not include rental payments received by Ladies' Hermitage in connection with Tulip Grove House.

2.   Plaintiff Field's request for an interpretation of the Warranty Deed contrary to this interpretation is DENIED.  No monetary relief is awarded.

Both parties agree that the language in the deed is plain and unambiguous.  The rules concerning the interpretation of deeds are well-settled and are designed to enable the courts to ascertain the intention of the parties to the deed.  *Mitchell v. Chance*, 149 S.W.3d 40, 44 (Tenn.Ct.App.2004)(citations omitted).  The courts should first seek the parties' intention by examining the words in the deed, *Hutchinson v. Board*, 250 S.W.2d 82, 84 (Tenn.1952), and by considering these words in the context of the deed as a whole.  *Collins v. Smithson*, 585 S.W.2d at 603; *Barber v. Westmoreland*, 601 S.W.2d at 714: *Quarles v. Arthur*, 231 S.W.2d 589, 590 (Tenn.Ct.App.1950).

We are persuaded that the interpretation of the term "gate receipts" to mean only the sale of individual tickets is too narrow.  The deed says "[a]ll gate receipts received by Grantee from visitors to Tulip Grove House on said land..."  We see nothing in that language or the surrounding circumstances that indicate the parties intended to restrict the scope of LHA's obligation to money received from visitors who hold an individual ticket, or to money received from visitors who have an interest in history.  We, therefore, hold that the term "gate receipts" in the deed includes the rent paid to LHA for use of the property for special events.

### III.  ISSUES RAISED BY LHA

#### A.  Res Judicata

LHA asserts on appeal that the issue of whether "gate receipts" covers special event income was decided by the lower court in 2008 and was affirmed by this Court on appeal.

We disagree.  In its September 12, 2008 motion for summary judgment LHA asked the court to hold that the term "gate receipts" did not include rents from special events.  The order submitted by counsel for LHA actually included that specific language.  But the chancellor modified the order to read as follows:

a. "gate receipts" is interpreted to mean general admission tickets sold by Ladies Hermitage to the public who chose to tour the Tulip Grove House and specifically does not include charges for private special event rentals of the grounds.

b. "received by Grantee [Ladies Hermitage] from visitors" is interpreted to mean gate receipts actually collected by Ladies Hermitage from visitors to Tulip Grove House.

c. "to Tulip Grove House on said land" is interpreted to mean gate receipts received from visitors to Tulip Grove House and specifically does not mean receipts from visitors who visited the Hermitage or walked or were transported across land surrounding The Hermitage, Tulip Grove House, or other property held in trust by The Ladies' Hermitage Association for the people of the State of Tennessee.

The phrase "on the grounds" in paragraph a. was in the chancellor's own handwriting.

On appeal, this Court pointedly did not review the trial court's order on this issue. The opinion states:

This October 27 order was expressly incorporated into the November 12 order that was appealed. The Heirs filed no opposition to the LHA motion for partial summary judgment pertaining to the accounting. It would be difficult to challenge the October order on appeal when no objection was raised to the trial court. In any event, on appeal the Heirs challenge only the November order finding that there was no reversion. Therefore, we make no comment and intend no inadvertent construction of the trial court's interpretation of the deed in its October 27 order.

The Court of Appeals opinion was filed on March 3, 2010.

-10-

On March 24, 2010 the lower court filed an order directing the plaintiff to set the case for a final hearing on or before October 1, 2010 "to dispose of all remaining issues."

Through several motions and hearings, the parties were allowed to file cross-motions for summary judgment. The plaintiff's motion asserted that LHA had breached its obligations under the deed by closing Tulip Grove to visitors in 2001. LHA's motion asserted that 1) the plain language of the deed showed that the obligations had not been breached, and 2) that the plaintiff's actions established a waiver or acquittance of the breach of contract claim.

On January 4, 2011, the court granted LHA's motion but specifically did not rule on the defenses of acquittance and waiver.

In the subsequent proceedings in the court below, the pleadings failed to join issue on whether "gate receipts" included special event revenues until the chancellor granted LHA summary judgment on whether LHA had an obligation to keep the house open for regular tours. In a motion to alter or amend, the plaintiff moved for specific findings of fact and conclusions of law on whether the heirs of Jane Buntin were entitled to one-third of the gate receipts for special events held at Tulip Grove. Over LHA's strenuous objection, the court allowed proof on the question of the special event income and set the cause for final hearing on July 13, 2011. After that hearing, the court entered its Final Order. It contained the following paragraphs:

> 1. The Court has held, and continues to hold, that the Warranty Deed should be interpreted and construed as a matter of law. Plaintiff Jane Field has presented a number of arguments that she, and her sister Ms. Gray, should, in addition to a portion of receipts from ticketed visitors to Tulip Grove House, have been paid by Ladies' Hermitage in the past, and be paid in the future, one-third of any rental payments received by Ladies' Hermitage in connection with special events at Tulip Grove House such as an occasional wedding reception or corporate/nonprofit function. Ladies' Hermitage has made payments since 1965 to the Grantor, Jane Buntin, or to the heirs of Jane Buntin, based upon receipts from ticketed visitors to Tulip Grove House. The Court holds that the Warranty Deed, and specifically the phrase "all gate receipts received by Grantee [Ladies' Hermitage] from visitors to Tulip Grove House located on said land" does not include rental

payments received by Ladies' Hermitage in connection with Tulip Grove House.

2. Plaintiff Field's request for an interpretation of the Warranty Deed contrary to this interpretation is DENIED. No monetary relief is awarded.

Comparing the 2008 order with the 2011 order, it is clear that "private special event rentals of the grounds" is not the same as "rental payments received by Ladies Hermitage in connection with Tulip Grove House."

We cannot conclude that the 2008 order covered the rental income from all private events at Tulip Grove.

## B. Acquittance

LHA asserts that the following provision in the warranty deed relieved it from any further liability once it had made payments to the recipients named in the deed. That provision is:

> ...[making] deposits in [First American National Bank of Nashville] shall relieve Grantee from any future liability or responsibility in connection with the future division or application of said payments and shall constitute a full acquittance to Grantee for such payments.

We are satisfied, however, that the quoted language, by its own terms, only relieves LHA from having to worry about how "said payments" would be divided among Jane Buntin's heirs. The key words are "any future liability or responsibility in connection with the future division or application of said payments..." In our opinion, the provision does not relieve the grantee from liability for failing to remit the proper amount to the Buntin heirs.

-12-

## V. CONCLUSION

The judgment of the court below is affirmed in part and reversed in part and the cause is remanded to the Chancery Court of Davidson County for any further proceedings necessary.  Tax the costs on appeal equally to the appellant and the appellee.

_____
BEN H. CANTRELL, SENIOR JUDGE