# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### December 6, 2023 Session Heard at Martin[1]

## PHARMA CONFERENCE EDUCATION, INC. v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Appeals**
**Tennessee Claims Commission for the Western Division**
**No. K20171856     James A. Hamilton III, Commissioner**

_____

### No. W2021-00999-SC-R11-CV
_____

Pharma Conference Education, Inc., entered into an agreement with the University of Tennessee Health Science Center to produce as many pharmaceutical continuing education programs "as is feasible." The Health Science Center terminated the agreement before any programs were held. When Pharma sued to enforce the agreement, the State argued that the agreement lacked consideration and therefore was not a valid contract. The question in this appeal is whether a promise to produce as many programs "as is feasible" constitutes consideration or instead is an illusory promise. We hold that this promise constitutes adequate consideration. We reverse the Court of Appeals' contrary decision and remand to the Claims Commission for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Remanded to the Claims Commission**

SARAH K. CAMPBELL, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, ROGER A. PAGE, and DWIGHT E. TARWATER, JJ., joined. HOLLY KIRBY, C.J., filed a concurring opinion.

William F. Burns, William Edward Routt III, and Frank Lee Watson III, Germantown, Tennessee, for the appellant, Pharma Conference Education, Inc.

T. Harold Pinkley, Jr., and Rebecca P. Tuttle, Knoxville, Tennessee, for the appellee, State of Tennessee.

---

[1] Oral argument was heard in this case on the campus of the University of Tennessee at Martin in Weakley County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

# OPINION

## I.

### A.

Pharma Conference Education, Inc., produces and manages continuing education programs for the pharmaceutical manufacturing and healthcare industry. John W. Smith is Pharma's current president and sole shareholder; he founded Pharma's predecessor in 1994. Thomas G. Bird, Ph.D., is Smith's business partner; he joined Pharma's management team in 2014.

In March 2016, Bird was introduced to Kennard D. Brown, Ph.D., the Executive Vice Chancellor and Chief Operations Officer of the University of Tennessee Health Science Center. Brown was interested in launching a Center of Excellence in supply-chain security, and he wanted to host a pharmaceutical conference as part of the new center's launch. Bird and Smith eventually met with Brown in San Antonio and discussed the possibility of a partnership in which Pharma would promote the Health Science Center through its educational programs.

The trio met a second time in Memphis. At that meeting's conclusion, the parties agreed that they had a mutual interest in developing and promoting programs and that the Health Science Center would provide continuing education credits for program attendees.

After the second meeting, Smith drafted a proposed memorandum of understanding and emailed it to Brown. Brown forwarded the memorandum to Anthony A. Ferrara, the Health Science Center's Vice Chancellor of Finance and Operations and the head of its contracts department. Ferrara inserted the memorandum into the Health Science Center's standard contract form, which was titled "The University of Tennessee Contract," made some additional revisions for discussion, and sent the revised draft back to Smith. Ferrara and Smith exchanged additional emails and drafts of the agreement over the course of several days.

Eventually, Ferrara sent the final version of the draft agreement to a staff member in Brown's office to initiate the formal contract review and approval process. During that process, multiple officials at the Health Science Center and in the University's contracts office reviewed and approved the agreement. The agreement also went through the University's "contract certification process."

The parties signed the agreement on July 8, 2016. Smith signed on behalf of Pharma, and the University's Interim Treasurer and Chief Financial Officer signed on behalf of the Health Science Center.

The agreement purported to impose obligations on both Pharma and the Health Science Center.[2] Pharma agreed that it would "produce as many scientific and/or pharmaceutical programs for consumption by the pharmaceutical and Health Industry as is feasible." Pharma promised to "report to the Chief Operating Officer" of the Health Science Center "any matters which might be of interest." Pharma had "sole responsibility for determining location, marketing, production, registration, contracting, collecting, printing of brochures and other publications, etc." Yet it was also obligated to "work closely with the [Health Science Center's] Chief Operating Officer to ensure quality programs are produced" and to "organize program committees" to work with the Health Science Center and Pharma "in developing as many programs as feasible." Pharma agreed to "compensate [the Health Science Center] for continuing education certification" at a rate of one percent of its program revenue in the first year, two percent in the second year, and an amount to be negotiated in later years. Other than this accreditation fee, Pharma was entitled to keep all revenue generated by the programs during the first two years. The parties agreed to negotiate an agreement for revenue sharing after two years. Pharma was also responsible for paying all costs incurred in developing the programs.

For its part, the Health Science Center agreed to serve as the sponsor of all the programs and to issue continuing education certification for program attendees. It further agreed to advertise its relationship with Pharma in a prominent location on its website.

The agreement was to remain in force for five years, with an option to renew for an additional five years at the end of that period if neither party wanted to terminate the relationship. If either party wished to terminate the agreement, it was required to give the other party one year's written notice.

Soon after Pharma and the Health Science Center began planning their first continuing education program, their relationship deteriorated. They were unable to agree on the composition of the first program committee and disagreed about the allocation of duties and responsibilities between the parties.

In January 2017, Brown sent Bird the following text message: "I'm over it Gary. I'm sending the termination notice to the Contract. Thanks for everything." Eventually, in July 2018, Brown also sent a termination letter to Smith via email.

B.

In May 2017, Pharma notified the Division of Claims Administration of its intent to assert a breach-of-contract claim against the Health Science Center. The Claims Commission has exclusive jurisdiction over "[a]ctions for breach of a written contract

---

[2] Because the parties dispute whether the signed agreement is a valid contract, this opinion refers to the document as an "agreement."

between [a] claimant and the state" when the contract "was executed by one (1) or more state officers or employees with authority to execute the contract." Tenn. Code Ann. § 9-8-307(a)(1)(L) (2020 & Supp. 2023). Before bringing a claim in the Claims Commission, the claimant must first provide written notice of the claim to the Division of Claims and Risk Management, which was previously called the Division of Claims Administration. *Id.* § 9-8-402(a)(1) (2020); *see also Kampmeyer v. State*, 639 S.W.3d 21, 24 n.8 (Tenn. 2022). This notice triggers a ninety-day informal settlement period. Tenn. Code Ann. § 9-8-402(c). If the Division fails to honor or deny the claim during the settlement period, it is required to transfer the claim to the Claims Commission. *Id.* If the complainant wishes to adjudicate the claim, it must file a complaint in the Claims Commission. *See Moreno v. City of Clarksville*, 479 S.W.3d 795, 804–05 (Tenn. 2015).

Here, the Division transferred Pharma's claim to the Claims Commission following the ninety-day settlement period. In September 2017, Pharma filed a complaint in the Claims Commission asserting a breach-of-contract claim against the Health Science Center. The Claims Commission treated the claim as one against the State of Tennessee after concluding that the State, and not the specific state entity that contracted with Pharma, was the proper defendant.

Both the State and Pharma moved for summary judgment. The State argued that the agreement between the parties was not a valid and enforceable contract for two reasons. First, it argued that Pharma's promise to hold as many programs "as is feasible" was illusory and did not constitute consideration. Second, it argued that there was no "meeting of the minds" between the parties. Pharma contended that the agreement between it and the Health Science Center was a valid contract and that the Health Science Center had breached that contract by unilaterally terminating the agreement before the expiration of the initial five-year term.

The Claims Commission granted summary judgment in favor of the State. It concluded that the agreement between Pharma and the Health Science Center lacked consideration. The Claims Commission reasoned that Pharma's promise to hold as many programs "as is feasible" was illusory; because Pharma had sole discretion "to determine if it is feasible for a program to be produced," it was not obligated "to do anything it does not wish to do." Although the Claims Commission indicated that its ruling was "based on the plain and ordinary meaning" of the agreement's language, it relied on Smith's deposition testimony to buttress its conclusion. It noted that Smith understood the agreement to give him sole discretion to decide whether it was feasible to produce a conference. Because the Claims Commission concluded that the contract lacked consideration, it did not address the State's alternative argument that there was no "meeting of the minds."

The Court of Appeals affirmed the Claims Commission's judgment. *Pharma Conf. Educ., Inc. v. State*, No. W2021-00999-COA-R3-CV, 2023 WL 2470288, at *7 (Tenn. Ct. App. Mar. 13, 2023). It agreed with the Claims Commission that Pharma's promise was illusory because the promise to produce as many programs "as is feasible" gave Pharma complete discretion regarding whether to perform. *Id.* at *6. The Court of Appeals acknowledged that Tennessee's statutory presumption of consideration applies in this case and that Tennessee courts generally endeavor to avoid finding a failure of consideration. *Id.* at *4–5. Yet the Court of Appeals still concluded that Pharma's promise was illusory. *Id.* at *6. Like the Claims Commission, the Court of Appeals relied on Smith's deposition testimony to support its conclusion that Pharma had complete discretion to decide whether to perform. *Id.* at *6. Given its conclusion regarding consideration, the Court of Appeals did not address the State's remaining arguments. *Id.* at *7.

We granted Pharma's application for permission to appeal to this Court. *Pharma Conf. Educ., Inc. v. State*, No. W2021-00999-SC-R11-CV, 2023 WL 5198449 (Tenn. Aug. 9, 2023).

II.

This Court reviews a trial court's ruling on a motion for summary judgment de novo, with no presumption of correctness. *Snake Steel, Inc. v. Holladay Constr. Grp., LLC*, 625 S.W.3d 830, 834 (Tenn. 2021) (citing *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015)). Whether a valid contract exists is a question of law. *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009) (citing *Murray v. Tenn. Farmers Assurance Co.*, No M2008-00115-COA-R3-CV, 2008 WL 3452410, at *2 (Tenn. Ct. App. Aug. 12, 2008)). Interpretation of a contract and a determination of the parties' intentions related to the contract are also questions of law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Accordingly, "the trial court's decisions relating to contract formation and its interpretation of the contract are not afforded a presumption of correctness." *German*, 300 S.W.3d at 702.

Contracts should be interpreted according to their plain terms, as those terms are ordinarily understood. *See, e.g.*, *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019) (explaining that "Tennessee courts give primacy to the contract terms, because the words are the most reliable indicator—and the best evidence—of the parties' agreement when relations were harmonious" (internal quotation marks omitted)); *Action Chiropractic Clinic, LLC v. Hyler*, 467 S.W.3d 409, 412 (Tenn. 2015) (explaining that "[w]e construe contractual language according to its 'plain, ordinary, and popular sense'" (quoting *West v. Shelbyville Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014))); *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (same); *Bob Pearsall Motors v. Regal Chrysler-*

*Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) (same); *Guardian Life Ins. Co. of Am. v. Richardson*, 129 S.W.2d 1107, 1116 (Tenn. 1939) (same).

III.

The principal issue in this appeal is whether Pharma's promise to produce pharmaceutical continuing education programs "as is feasible" constitutes consideration. "Adequate consideration is a necessary ingredient for every contract." *In re Estate of Brown*, 402 S.W.3d 193, 200 (Tenn. 2013) (citing *Bratton v. Bratton*, 136 S.W.3d 595, 600 (Tenn. 2004)); *Smith v. Pickwick Elec. Coop.*, 367 S.W.2d 775, 780 (Tenn. 1963) ("A contract has been defined over the years as an agreement, upon sufficient consideration, to do or not to do a particular thing."). Consideration exists when a party does something "he or she has no legal obligation to do or refrains from doing something that he or she has a legal right to do." *Estate of Brown*, 402 S.W.3d at 200. "Any consideration, however small, will support a promise." *Danheiser v. Germania Sav. Bank & Tr. Co.*, 194 S.W. 1094, 1096 (Tenn. 1917). Even mutual promises may serve as adequate consideration. *Estate of Brown*, 402 S.W.3d at 200. And "[c]onsideration may be either a benefit to the promisor or a detriment to or obligation upon the promisee." *Bratton*, 136 S.W.3d at 602. When consideration is lacking, there is no valid contract. *Estate of Brown*, 402 S.W.3d at 200 ("Without mutual consideration, a contract is invalid and unenforceable."); 3 *Williston on Contracts* § 7:11 (4th ed.), Westlaw (database updated May 2024) ("Where no consideration exists, and is required, . . . a lack of consideration results in no contract being formed.").

An illusory promise is not adequate consideration. *German*, 300 S.W.3d at 704. An illusory promise essentially promises nothing at all, gives the promisor the option to refrain from performing, or is too indefinite to be enforceable. *Id.*; *Rode Oil Co., Inc. v. Lamar Advert. Co.*, No. W2007-02017-COA-R3-CV, 2008 WL 4367300, at *10 (Tenn. Ct. App. Sept. 18, 2008). But "[c]ourts . . . generally endeavor to avoid finding that a promise was illusory and that there was thereby a failure of consideration." *Rode Oil Co.*, 2008 WL 4367300, at *10.

Pharma argues that the Claims Commission and Court of Appeals erred by interpreting the agreement to give Pharma unfettered discretion to decide whether to perform. First, Pharma points to Tennessee Code Annotated section 47-50-103, which provides that "[a]ll contracts in writing signed by the party to be bound . . . are prima facie evidence of a consideration," and argues that this provision creates a statutory presumption of consideration that the State has the burden to overcome. Second, Pharma invokes the implied covenant of good faith and fair dealing and argues that the "as is feasible" language must be interpreted in light of this covenant to require commercially reasonable conduct. But Pharma maintains that the text of the contract amounts to consideration even without considering the implied covenant of good faith and fair dealing. Pharma further contends

that Smith's deposition testimony is irrelevant because the interpretation of a contract is a legal question for the Court and that, in any event, the testimony cuts in favor of Pharma, not the State.

The State insists that Pharma's promise is illusory because it does not meaningfully constrain Pharma or require it to produce any programs. It argues that Tennessee Code Annotated section 47-50-103 is inapplicable here because it applies only to contracts, and the agreement in this case is not a contract. Similarly, it argues that the implied covenant of good faith and fair dealing comes into play only when an enforceable contract already exists. Finally, the State contends that Smith's deposition testimony is relevant extrinsic evidence of the contract's meaning and establishes that Pharma had complete discretion whether to produce any programs.

A.

We begin with Tennessee Code Annotated section 47-50-103. That provision states that "[a]ll contracts in writing signed by the party to be bound, or the party's authorized agent and attorney, are prima facie evidence of a consideration." Tenn. Code Ann. § 47-50-103 (2013). We have explained that this provision establishes a "presumption" of consideration. *Estate of Brown*, 402 S.W.3d at 200. "[T]he party claiming a lack of consideration for a validly executed contract has the burden of overcoming this presumption." *Id.*

Seeking to avoid this burden, the State argues that section 47-50-103 applies only to "contracts" and that the term "contracts" means validly formed contracts, not agreements lacking consideration. On this logic, the State reasons that section 47-50-103 is inapplicable here because its agreement with Pharma is not a valid and enforceable contract.

The State's position is untenable. The term "contract" often refers to a binding agreement that creates enforceable obligations. *E.g., Contract*, Black's Law Dictionary (11th ed. 2019) (defining "contract" as "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law"). Here, however, interpreting "contracts" in section 47-50-103 to mean only legally valid and enforceable contracts would render that statutory provision a nullity. If the State is correct that "contracts in writing" are prima facie evidence of consideration *only* when they are already adequately supported by consideration, then the statute is wholly unnecessary. Application of the statute makes sense only in cases, like this one, where consideration is disputed. Because we must interpret a statute "in a way that makes sense rather than nonsense," *Powell v. Cmty. Health Sys., Inc.*, 312 S.W.3d 496, 508 (Tenn. 2010), and avoid interpretations that would render statutory language useless, *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010), we must reject the State's reading.

In the context of section 47-50-103, the term "contract" is better understood to include a written agreement that *purports to be* a contract, even when consideration is disputed. This reading finds support in the Restatement (Second) of Contracts, which explains that the term "contract" is "sometimes used as a synonym for 'agreement' or 'bargain'" and may refer to "legally ineffective agreements." Restatement (Second) of Contracts § 1 cmt. a (Am. L. Inst. 1981) (noting, moreover, that the term "contract" in a statute "may be given still other meanings by context or explicit definition"). This interpretation is also consistent with decisions of our Court, the Court of Appeals, and federal courts applying section 47-50-103 in cases in which adequate consideration is disputed. *See*, *e.g.*, *Estate of Brown*, 402 S.W.3d at 200; *Lance v. Alcoa Hotel Hosp., LLC*, No. E2019-01100-COA-R3-CV, 2020 WL 6708231, at *5 (Tenn. Ct. App. Nov. 16, 2020); *Toliver v. Wall*, No. M2006-00910-COA-R3-CV, 2007 WL 1890648, at *2 (Tenn. Ct. App. June 28, 2007); *Jackson v. Me. Pointe, LLC*, No. 3:16-CV-604, 2018 WL 1371488, at *3–4 (E.D. Tenn. Mar. 16, 2018).

The agreement at issue in this case is in writing, and it is signed by the party to be bound. Section 47-50-103 therefore applies here. As the party arguing lack of consideration, the State has the burden of overcoming the prima facie evidence of consideration. *Estate of Brown*, 402 S.W.3d at 200.

B.

The State offers two arguments to overcome the presumption of consideration that attaches to the parties' written and signed agreement under section 47-50-103. The State first argues that the contract does not define the term "feasible" and therefore gives Pharma complete discretion to determine whether to hold programs. As a result, the State posits, Pharma has no obligation at all. The State further argues that Smith's deposition testimony about his subjective interpretation of the agreement confirms that Pharma was not obligated to perform. We consider each argument in turn.

1.

The State's first argument rests on the agreement's language. The State points out that the agreement does not identify any criteria for determining whether it is "feasible" to put on a program. In the absence of such criteria, the State reasons, Pharma can do whatever it wants, rendering its promise to hold programs illusory.

If the State were right that the contract gives Pharma complete discretion to decide whether to produce programs, we would agree that the promise is illusory. *See German*, 300 S.W.3d at 704 ("A promise is illusory when it fails to bind the promisor, who retains the option of not performing[.]"). But the contract does not give Pharma such unfettered discretion.

The contract provides that Pharma "will produce as many . . . programs . . . as is feasible." The term "will" is mandatory, not discretionary. *See Hewitt v. Helms*, 459 U.S. 460, 471 (1983) (superseded by statute on other grounds) (stating that the word "will," like "shall" and "must," has "an unmistakably mandatory character"); *Monadnock Reg'l Sch. Dist. v. Monadnock Dist. Educ. Ass'n, NEA-NH*, 242 A.3d 789, 797 (N.H. 2020) ("The plain meaning of a phrase stating that a certain event 'will' occur is that the occurrence of the event is mandatory or obligatory, not permissive or discretionary."). Pharma therefore is *required* to produce as many programs "as is feasible."

As the State points out, the contract does not define the term "feasible" or identify criteria to guide Pharma's determination as to what is feasible. But that was not necessary because the term "feasible" has a well-accepted meaning. Feasible means "capable of being done." *Feasible*, The American Heritage Dictionary of the English Language 645 (5th ed. 2012) (defining "feasible" as "[c]apable of being accomplished or brought about; possible"); *Feasible*, Merriam-Webster's Collegiate Dictionary 458 (11th ed. 2003) (defining "feasible" as "capable of being done or carried out"); *see also Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 508–09 (1981) (using dictionaries to identify the "plain meaning" of the word "feasible"). Whether a continuing education program is capable of being done turns on objective factors such as venue availability, speaker availability, and resource constraints. If Pharma refused to produce any programs or produced fewer than the Health Science Center desired, a court could determine whether Pharma had breached the contract by looking to these and other objective criteria to determine how many programs Pharma could produce.

The State cites *Smith v. Chickamauga Cedar Co.* to support its position that Pharma's promise is illusory. 82 So. 2d 200 (Ala. 1955). In *Smith*, a lumber company agreed to "furnish logs . . . in such quantities as [the company] *deems* feasible and economical." *Id.* at 201 (emphasis added). The Alabama Supreme Court concluded that this promise was illusory because the phrase "deems feasible and economical" gave the company "sole discretion" to determine what quantity of logs to supply and rendered the company's obligation "too indefinite for legal enforcement." *Id.* at 202. In reaching that conclusion, the court examined dictionary definitions not only of the terms "feasible" and "economical," but also of "deems," which means "[t]o have an opinion; to judge; believe" or "[t]o conclude or believe on consideration." *Id.* (quoting *Deem*, Webster's New International Dictionary 685 (2d ed.)). The promise was illusory not because the agreement used the term "feasible," but rather because it allowed the lumber company to unilaterally deem what is or is not feasible.

The State contends that the language at issue in *Smith* is "virtually identical" to the language at issue here. We disagree. The agreement here requires Pharma to produce as many programs "as is feasible"—not as many programs as Pharma *deems* feasible. This is an important difference. Unlike the lumber company in *Smith*, Pharma does not have sole

discretion to decide what is feasible. Feasibility is determined by an objective standard, not Pharma's subjective determination.

The State nevertheless insists that the agreement's "feasibility" standard is too indefinite to be enforceable. To be sure, a requirement to produce as many programs "as is feasible" is less definite than a requirement to produce a specific or minimum number of programs or to produce programs if certain specified conditions are satisfied. But an objective feasibility standard is definite enough to meaningfully constrain Pharma's discretion and to enable a reviewing court to determine whether a breach has occurred. That is all that is required. *See, e.g.*, Restatement (Second) of Contracts § 33 ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."); *Id.* § 34 ("The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance."). As the Restatement (Second) of Contracts explains, "one party is often given a wide choice" with respect to matters such as "subject matter and price" in the course of performing a contract. *Id.* § 34 cmt. a. As long as the party's discretion is limited, it does not invalidate the contract. *See id.* cmt. b (explaining that "limits on the power [of selection] may be either express or implied"). The agreement here allows Pharma some discretion regarding how to comply with its obligation to produce programs, but that discretion is appropriately limited by the feasibility standard. The requirement that Pharma produce as many programs "as is feasible" is therefore sufficiently definite to constitute an enforceable promise.

2.

The State urges us to consider not only the contractual language, but also Smith's deposition testimony regarding his subjective understanding of that language. During his deposition, counsel asked Smith whether it was his "understanding that it was within Pharma's ability and Pharma's sole determination to decide what conferences were feasible to produce."[3] Smith responded, "Yes." The State claims that this testimony alone is sufficient to rebut the presumption of consideration and that we may consider this extrinsic evidence of the contract's meaning. Pharma counters that the interpretation of a contract is a question of law for the Court and that, regardless, Smith's testimony shows that Smith understood the feasibility standard to limit his discretion.

We recently addressed "the use of extrinsic evidence in the interpretation of contracts" in *Individual Healthcare Specialists*. 566 S.W.3d at 676. There, we reiterated that the "written words" of the contract should remain "the lodestar of contract

---

[3] The State also contends that Smith agreed that the purported contract did not contain any criteria to determine feasibility or any metric by which Pharma could determine feasibility. This is incorrect. Smith expressly disagreed with this contention and only agreed that he believed he had sole discretion to determine feasibility under the agreement.

interpretation." *Id.* at 694. But we clarified that "extrinsic evidence may be used to put the written terms of the contract into context" as long as it is not used to "vary, contradict, or supplement the contractual terms in violation of the parol evidence rule." *Id.* at 698. We explained that our precedents reflected a "balance": "[T]hey demonstrate a definite focus on the written words in the parties' contract, but they also consider evidence related to the situation of the parties and the circumstances of the transaction in interpreting those words." *Id.* at 692. In addition to the "situation of the parties" and the "circumstances of the transaction," *id.*, our precedents have considered "the subject matter" of the contract, *Penske Truck Leasing Co., L.P.*, v. *Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990), "the parties' actions in carrying out the contract," *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012), the parties' "course of previous dealings," *Kroger Co. v. Chem. Secs. Co.*, 526 S.W.2d 468, 471 (Tenn. 1975) (quoting *Jeffers v. Hawn*, 212 S.W.2d 368, 370 (Tenn. 1948)), and the parties' motivations and interests, *Ashley v. Volz*, 404 S.W.2d 239, 242 (Tenn. 1966).

Although the State is correct that our precedents allow courts to consider extrinsic evidence of context when interpreting a contract, we have never suggested that this category of evidence includes a party's post-litigation testimony about his subjective understanding of the contract's language. Other courts have squarely rejected consideration of this sort of testimony, even when consideration of context is otherwise allowed. *See, e.g.*, *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 96 (Md. 2021) ("[R]etrospective, subjective, and unexpressed views about the contract are not proper extrinsic evidence[.]"); *In re Estate of Fields*, 219 P.3d 995, 1012 n.57 (Alaska 2009) ("[S]elf-serving litigation-related expressions of prior subjective intent or understanding are generally not considered probative of parties' reasonable expectations when they entered into a contract; the court instead must look to express manifestations of each party's understanding."); *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (Wash. 1999) (en banc) (holding that "admissible extrinsic evidence does *not* include . . . [e]vidence of a party's unilateral or subjective intent as to the meaning of a contract word or term"); *Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756 (3d Cir. 2017) (stating that "extrinsic evidence of one party's undisclosed, subjective understanding, intent, or opinion about the meaning of ambiguous contract language cannot be used to substantiate a particular interpretation of that language"). In *URI, Inc. v. Kleberg County*—a case we cited approvingly in *Individual Healthcare Specialists*, 566 S.W.3d at 697–99—the Texas Supreme Court explained that "only circumstantial evidence that is objective in nature may be consulted." 543 S.W.3d 755, 768 (Tex. 2018).

We agree with this approach. Our job is to interpret contract terms as those terms are ordinarily understood. Evidence concerning a party's subjective understanding of the contract's terms—untethered from industry practice, the parties' course of dealing, or other potentially relevant context—is irrelevant to that inquiry. Although it is appropriate to consider contextual evidence that sheds light on the objective meaning of a contract's

terms, a party's subjective views on the contract's meaning generally do not fall into that category and therefore should not be considered. To the extent the State seeks to rely on Smith's testimony to supplement or contradict the contract's express terms, moreover, the parol evidence doctrine would independently bar that use of the testimony. *See Individual Healthcare Specialists*, 566 S.W.3d at 698 (explaining that extrinsic evidence cannot be "used to vary, contradict, or supplement the contractual terms in violation of the parol evidence rule").[4]

Regardless, even if we were to consider Smith's deposition testimony, it is not nearly as conclusive as the State contends. As Pharma points out, Smith explained during his deposition testimony that he understood the term "feasible" to entail consideration of factors such as whether "there [was] a market for a particular program," whether Pharma had cash on hand for required deposits, and "security issues." Smith did not understand the contract to allow Pharma to act—or not act—on a whim. Instead, he understood the contract to allow Pharma to determine whether it was feasible to hold a program, considering all of the factors that would ordinarily go into such a determination. This testimony does not establish that Pharma had unfettered discretion to decide whether to perform.

\*     \*     \*

In sum, the State has failed to rebut the statutory presumption of consideration that attaches to the written agreement between Pharma and the Health Science Center under section 47-50-103. Pharma's promise to produce as many programs "as is feasible" is not illusory; Pharma's discretion is limited by the feasibility standard, which is sufficiently definite to allow a court to determine whether a breach has occurred. This promise constitutes sufficient consideration. Because we conclude that the contract's express language meaningfully constrains Pharma's discretion, we need not consider Pharma's alternative argument that the implied duty of good faith and fair dealing provides consideration. We also decline to reach the State's argument that the contract is invalid because there was no "meeting of the minds" between the parties. Neither the Claims Commission nor the Court of Appeals has considered that issue, and the Claims Commission should do so in the first instance.

---

[4] In her separate opinion, Chief Justice Kirby finds it "unsurprising that Mr. Smith's deposition testimony was admitted into evidence" because it was "an admission against interest that facially related to the meaning of a disputed contract term." Generally, subjective testimony of this sort is not relevant to the objective meaning of contractual language and should not be admitted unless it is relevant to another issue in the case. *See* Tenn. R. Evid. 401 (defining "[r]elevant evidence"); Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible."). As Chief Justice Kirby correctly explains, however, even if extrinsic evidence is admitted without objection, the parol evidence rule nevertheless bars the *use* of that evidence to vary or contradict the terms of a written agreement. *See, e.g.*, *Individual Healthcare Specialists*, 566 S.W.3d at 696.

**CONCLUSION**

We hold that Pharma's promise to produce as many programs "as is feasible" constitutes consideration. We reverse the judgment of the Court of Appeals and remand to the Claims Commission for further proceedings consistent with this opinion, including consideration of the State's argument regarding mutual assent.

_____
SARAH K. CAMPBELL, JUSTICE